# United States Court of Appeals

## For the First Circuit

No. 02-1927

LAURA M. BLOCKEL,

Plaintiff, Appellee,

v.

J. C. PENNEY COMPANY, INC.,

Defendant, Appellant.

No. 02-1946

LAURA M. BLOCKEL,

Plaintiff, Appellant,

v.

J. C. PENNEY COMPANY, INC.,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Frank H. Freedman, <u>Senior U.S. District Judge</u>]

Before

Selya, <u>Circuit Judge</u>,
Coffin and Porfilio,[*] <u>Senior Circuit Judges</u>.

[*]Of the Tenth Circuit, sitting by designation

          Nicholas A. O'Kelly with whom Michael E. Satti, Holly
Quackenbush Darin, and Satti & Ryan, LLP, were on brief for J.C.
Penney.
          Marwan S. Zubi with whom Paul Peter Nicolai and Nicolai Law
Group were on brief for Blockel.

July 23, 2003

**COFFIN**, <u>Senior Circuit Judge</u>.  Defendant-appellant J.C. Penney Company claims multiple errors in the trial and post-judgment orders regarding the disability discrimination claims of Laura Blockel, a former J.C. Penney employee.  Blockel also appeals, alleging error in the district court's calculation of prejudgment interest.  Finding no errors, we affirm the judgment below.

## I.  Background

A reasonable jury could have found the following facts in support of its verdict in favor of Blockel.

Laura Blockel was hired by J.C. Penney as a "merchandise manager trainee" in 1985.  She was promoted in the following years, receiving favorable evaluations and merit pay increases, until she reached the position of "senior merchandise manager" at the Sturbridge, Massachusetts, store in 1988.  As a senior merchandise manager, Blockel was responsible for purchasing and managing the merchandise in a particular area of the store, ultimately the men's department, and supervising customer service in that area.  She routinely received scores of 2 (on a scale of 1 to 5, 1 being the highest) on her annual performance evaluations.

In 1995, Blockel was diagnosed with a seizure disorder, major depression, and post-traumatic stress disorder.  In 1997, she was also diagnosed with bi-polar disorder, schizo-affective disorder, and dissociative disorder.  On several occasions in 1996 and 1997, Blockel was hospitalized due to her illnesses for up to ten days at

a time.  Her symptoms included seizures, severe depression, catatonic states, auditory and visual hallucinations, delusions, and suicidal ideation.  She attempted suicide more than once.

In order to control these symptoms, Blockel was treated with a variety of anti-psychotic, anti-anxiety, anti-depressant, and mood stabilizing drugs.  Her treating psychiatrist, Dr. Zamir Nestelbaum, testified that without these medications, Blockel would not have been able to care for herself or work throughout 1996 and 1997.  Blockel visited both a psychologist and Dr. Nestelbaum approximately once a week after her diagnoses.

Stress related to heavy work hours was adjudged by Dr. Nestelbaum to exacerbate Blockel's symptoms.  Consequently, he provided Blockel with notes for her employer several times in 1996 and 1997, setting restrictions on the number of hours she should work each day or week.  At times she was limited to six hours of work per day.  The manager of the Sturbridge store, James Eltringham, consistently honored Blockel's accommodation requests.

With these restrictions, Blockel was able to perform all the essential functions of her job.  In fact, she received scores of "2" on her performance evaluations for the years 1995 and 1996. In 1996 and 1997, she was invited to take part in the "Entity Team," a group of five senior managers selected for their superior merchandising skills.

In May 1997, Lois Rainero replaced Eltringham as the manager of the Sturbridge store. Rainero had previously held the position of "district personnel manager" and had received training in handicap discrimination and reasonable accommodations.

In September 1997, Blockel suffered a seizure at work and was taken to the hospital by ambulance. She remained hospitalized for a week. Upon returning to work, Blockel told Rainero that she had been admitted to the psychiatric ward, suffered from mental illnesses, and was heavily medicated. She also explained that she felt she would be able to continue fulfilling her job responsibilities as long as her work hours were limited. She provided Rainero with a note from Dr. Nestelbaum stating that she should not work more than forty hours per week.

The forty-hour restriction was adhered to in October, but with the holiday season approaching, Blockel feared that the hours expected of her would escalate. To ensure that her limitations would be taken into account, she offered to draft the holiday schedule, a task she did not customarily perform. Blockel's proposal limited her scheduled hours to forty per week, but it was rejected by Rainero as leaving the store short on coverage. The revised schedule, drafted by another senior merchandise manager, assigned Blockel between thirty-seven-and-a-half and forty-nine hours per week. This schedule began October 26.

On November 12, Blockel met with Rainero to remind her of the restriction.  Rainero responded that Blockel was not being a team player, that she would be a burden on the other senior merchandise managers, and that her career at J.C. Penney would effectively be over if she did not work her scheduled hours during the holiday season.

The following day, Blockel left a note for Rainero, to which Rainero never responded, stating that she loved her job and did not want to be a burden on her fellow managers.  She concluded that she would try to work the schedule as posted, despite its requirement that she work more than forty hours per week.  Ultimately, Blockel worked between fifty and sixty hours weekly during November and December.

Simultaneously, Blockel's symptoms worsened significantly.  Between November 1997 and January 1998, her condition was progressively downgraded by her doctors. Dr. Nestelbaum attributed her deterioration to the high number of hours she was working and her anxiety that reducing her hours would impact her future at J.C. Penney.  In early January 1998, Blockel was hospitalized for ten days.  She took sick leave, informed Rainero that she would not be returning, and applied for long-term disability benefits.

Sometime in January, district manager Phyllis Seberger met with Rainero to discuss the evaluations of the senior merchandise managers, which were finalized in late January.  In late February

1998, Blockel was asked to come to the store for a meeting of the managers. Blockel protested that she was out on sick leave and not able to attend but was informed that it was mandatory.

At that meeting, Blockel was presented with her completed evaluation, in which she was rated a "3". In contrast with previous years, Blockel was not given the chance to review the evaluation and provide feedback before it was finalized. After the evaluation was presented to Blockel, Seberger informed her that a reduction in force was being implemented at J.C. Penney and that, because of her "3" rating, she was being terminated. Later, Blockel retrieved her actual sales numbers and discovered errors in the computation of her sales and profit figures that formed the basis for the evaluation and made her performance appear less favorable.

After her termination, Blockel's sick pay and application for long-term disability were denied by J.C. Penney because she was no longer an employee. J.C. Penney eventually reversed its decision and granted her long-term disability benefits. Blockel also was granted federal Social Security disability benefits.

In April 1998, Blockel filed claims before the Massachusetts Commission Against Discrimination (MCAD) alleging that J.C. Penney violated the protections found in Massachusetts General Laws Chapter 151B. Due to delays in the MCAD process and the impending expiration of the statutes of limitations on her claims, Blockel

filed suit in state court in 2000. J.C. Penney subsequently removed the lawsuit to federal district court.

In March 2002, a jury rendered a verdict in Blockel's favor, finding that J.C. Penney failed to reasonably accommodate her and that it engaged in retaliatory harassment. The jury awarded Blockel compensatory and punitive damages, as well as back pay, in the aggregate amount of $563,700. The district court subsequently awarded her attorney's fees and costs, as well as $28,564.43 in prejudgment interest on the compensatory damages portion of the award.

J.C. Penney raises multiple issues in its appeal while Blockel makes a single claim in her cross-appeal.

## II. **Notice of Appeal**

Preliminarily, Blockel protests that this court does not have jurisdiction to hear any of J.C. Penney's claims due to a deficiency in J.C. Penney's designation of the order from which it appeals.

On March 21, 2002, the jury returned its verdict in favor of Blockel. On March 25, the district court entered judgment for Blockel, including prejudgment interest. On April 3, Blockel filed a motion for attorney's fees and costs as well as additional prejudgment interest. On April 8, J.C. Penney filed a motion for judgment notwithstanding the verdict pursuant to Fed. R. Civ. P. 50(b), which, as a recognized type of post-judgment motion,

-8-

extended the time for appealing the March 25 judgment. See Fed. R. App. P. 4(a)(4)(i).

On June 27, the district court issued a memorandum and order denying J.C. Penney's Rule 50(b) motion and granting Blockel's motion for fees and costs, but denying her request for additional prejudgment interest. On July 2, the court entered a judgment that read: "Pursuant to the memorandum and order of the court entered on June 27, 2002, judgment for the plaintiff with attorney's fees awarded in the amount of $71,514.67 and costs awarded in the amount of $4,706.11." On July 18, J.C. Penney filed a notice of appeal, specifying the July 2 entry as the judgment appealed from. See Fed. R. App. P. 3(c)(1)(B) (requiring an appellant to "designate the judgment, order, or part thereof being appealed" in the notice of appeal).

Blockel maintains that the July 2 order resolved only the amount of the attorney's fees and costs. Blockel thus urges us to read J.C. Penney's notice of appeal as limited to issues concerning attorney's fees and costs, exclusive of the judgment and issues raised post-judgment. Citing Town of Norwood v. New England Power Co., 202 F.3d 408 (1st Cir. 2000), Blockel notes that a notice of appeal naming only the denial of a post-judgment motion generally does not bring the original judgment before an appellate court. See id. at 415.

Nevertheless, the requirements of Rule 3(c) are to be construed liberally. See Kotler v. Am. Tobacco Co., 981 F.2d 7, 11 (1st Cir. 1992) (citing Smith v. Barry, 502 U.S. 244, 248 (1992); Foman v. Davis, 371 U.S. 178, 181-82 (1962)). "Noncompliance with 'mere technicalities' will not defeat appellate jurisdiction," id. (quoting Foman, 371 U.S. at 181), "so long as the litigant's filing 'is the functional equivalent of what the rule requires,'" id. (quoting Torres v. Oakland Scavenger Co., 487 U.S. 312, 317 (1988)). Moreover, the rule of Norwood is "not inflexible." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 839 (1st Cir. 1993); see also Norwood, 202 F.3d at 415 (stating that because the "failure to name the underlying judgment is usually a slip of the pen and rarely causes any prejudice to the other side," courts often "rescue the technically defaulted portion of the appeal").

Further, we review the notice of appeal in the context of the entire record. See Chamorro v. Puerto Rican Cars, Inc., 304 F.3d 1, 3 (1st Cir. 2002); John's Insulation, Inc. v. L. Addison & Assocs., Inc., 156 F.3d 101, 105 (1st Cir. 1998). "[T]he core purpose of a notice of appeal is to 'facilitate a proper decision on the merits.'" Chamorro, 304 F.3d at 3 (quoting Foman, 371 U.S. at 182).

We do not construe J.C. Penney's appeal to be limited to the issue of attorney's fees. The district court's reference, in its July 2 judgment, to the June 27 memorandum and order, is not

-10-

limited to that portion of the order dealing with fees and costs. Although the court's intention is not absolutely clear, the July 2 judgment can plausibly be read to incorporate the entirety of the June 27 memorandum and order denying J.C. Penney's motion for judgment notwithstanding the verdict.

Moreover, reviewing the record as a whole, J.C. Penney consistently sought merits-based reviews during and after trial, it filed a request for a full trial transcript contemporaneously with filing its notice of appeal, and its brief to this court addressed the underlying merits. See, e.g., Norwood, 202 F.3d at 415 (considering fact that appellant presented same arguments on merits below as on appeal). Thus, J.C. Penney's intent to appeal the merits of the underlying judgment was sufficiently clear to provide this court with jurisdiction to review the issues raised in its Rule 50(b) motion.[1]

### III. **Denial of Motion for Judgment Notwithstanding the Verdict**

The jurisdiction issue resolved, we review the district court's denial of a motion for judgment notwithstanding the verdict de novo. See Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41 (1st Cir. 2002). "Our review is weighted toward preservation of the jury verdict; [w]e must affirm unless the evidence was so

---

[1]Although Blockel is correct that J.C. Penney's notice of appeal does not state the court to which the appeal was taken, technically a violation of Rule 3(c)(1)(C), we decline to eschew jurisdiction based on such an inconsequential omission because the only avenue of appeal from the district court is to this court.

strongly and overwhelmingly inconsistent with the verdicts that no reasonable jury could have returned them." Id. at 41-42 (internal quotations omitted).

## A. Blockel's Prima Facie Case

J.C. Penney contends that Blockel failed to make out her prima facie case in multiple respects. The company argues that Blockel failed to prove: first, that she was a "qualified handicapped person" under the Massachusetts statute; second, that her impairments constituted a "disability"; and third, that J.C. Penney refused to accommodate her.

### i. Waiver

Blockel argues preliminarily that J.C. Penney has waived all arguments regarding the sufficiency of the evidence because its initial motion for judgment as a matter of law, brought pursuant to Rule 50(a) at the close of evidence, was not made with sufficient specificity. We note, however, that J.C. Penney's Rule 50(a) motion was cut short by the judge's pronouncement that the motion was considered filed and denied.[2] Although generally it is

---

[2]The exchange occurred as follows:
COUNSEL: Your Honor, one matter the defendant has not – we did want to proceed with our motions for directed verdict on certain issues.
THE COURT: I never noticed that you filed one at the close of plaintiff's evidence. I said at the time that I believed after the evidence was complete.
COUNSEL: I believe that we –
THE COURT: Motion for directed verdict has been filed, and it's on the record, and the Court denies it.

incumbent upon a party to enunciate the specific basis for a motion for judgment as a matter of law, see Fed. R. Civ. P. 50(a)(2), here, the district court foreclosed J.C. Penney's opportunity to make its arguments with any specificity. Under these circumstances J.C. Penney cannot be faulted for failing to provide more detail. See, e.g., Wilson Sporting Goods v. David Geoffrey & Assocs., 904 F.2d 677, 683 (Fed. Cir. 1990)(stating that "[i]t would be unfair to require counsel to have developed a statement of evidentiary shortcomings which the magistrate obviously did not want to hear"), overruled in part on other grounds by Cardinal Chem. Co. v. Morton Int'l, 508 U.S. 83 (1993).

But Blockel's second waiver argument holds more force. Blockel contends that in its subsequent Rule 50(b) motion for judgment notwithstanding the verdict J.C. Penney enunciated only the first of the three particular sufficiency arguments it makes on appeal.

In its Rule 50(b) motion, J.C. Penney did contend that Blockel had not made out a prima facie case. Specifically, however, it argued only that Blockel failed to prove her status as a "qualified handicapped person." J.C. Penney did not make the arguments that Blockel failed to prove that she had a disability or that J.C. Penney refused to accommodate her. As we have said many times before, unless an issue is raised squarely before the district court, it can be reviewed only for plain error. See, e.g., In re

-13-

Rauh, 119 F.3d 46, 51 n.7 (1st Cir. 1997) ("We consider arguments raised for the first time on appeal only in exceptional circumstances threatening a 'clear miscarriage of justice.'" (quoting Playboy Enters., Inc. v. Public Serv. Comm'n of Puerto Rico, 906 F.2d 25, 40 (1st Cir. 1990)). We find no such error here.

J.C. Penney contends that raising the overarching issue of whether Blockel had made out her prima facie case was sufficient to preserve its arguments on each aspect of Blockel's prima facie case. Our precedent, however, indicates that more specificity is required. In Pstragowski v. Metropolitan Life Insurance Co., 553 F.3d 1 (1st Cir. 1997), we stated that "a party who moved for a directed verdict may obtain appellate review only on the specific ground stated in the motion." Id. at 3; see also Lynch v. City of Boston, 180 F.3d 1, 13 (1st Cir. 1999) (stating that the rule requires that grounds for a motion must "be stated with sufficient certainty to apprise the court and opposing counsel of the movant's position" (internal citation omitted)). Further, on the venerable principle of "expressio unius est exclusio alterius," J.C. Penney's inclusion of one particular argument regarding Blockel's prima facie case indicated to both Blockel and the court that this was the sum total of its arguments on this front. We therefore consider only whether Blockel met her burden of showing her status as a protected handicapped employee.

-14-

### ii. "Qualified Handicapped Person"

The Massachusetts anti-discrimination statute defines a "qualified handicapped person" as a "handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." Mass. Gen. Laws ch. 151B, § 1(16).  J.C. Penney claims that Blockel was not a "qualified handicapped person" because she did not prove that she was able to perform the essential functions of her job from October through December 1997.  J.C. Penney's argument rests on Blockel's testimony that she could not do the job of merchandise manager in forty hours a week.  Specifically, she testified:

> Q.  And what I'm curious about is are you saying that by restricting your hours to only 40 hours a week you could not do the essential functions of your job as a merchandiser?
> A.  That's right.

J.C. Penney relies primarily upon <u>August</u> v. <u>Offices Unlimited, Inc.</u>, 981 F.2d 576 (1st Cir. 1992).  In <u>August</u>, when the record was "fatally bereft of indication" that the disabled plaintiff could perform his job even with an accommodation, this court affirmed summary judgment for the employer on the plaintiff's employment discrimination claims.  <u>See</u> <u>id.</u> at 581-82.

Here, Blockel presented other evidence sufficient to allow the jury to conclude that working more than forty hours per week was not an essential function of Blockel's position.  For example,

Rainero testified that senior merchandise managers were not required to work more than forty hours a week. In addition, a senior merchandise manager testified that it would be possible for managers to perform their duties, even during the holiday season, within a forty hour schedule. Blockel also presented evidence of her past superior performance despite hourly work restrictions.

Even assuming that Blockel understood the question and taking her response that she could not perform the job in forty hours at face value, in light of the countervailing evidence, the sum of the evidence was not "so strongly and overwhelmingly inconsistent" with the jury verdict, Rodowicz, 279 F.3d at 41-42 (internal citations omitted), that the verdict must be overturned.

Here, Blockel asserted that she was a qualified individual at the time that she asked for the forty hour week accommodation. In contrast with the facts of August, all of Blockel's disability insurance and benefit claim forms report total disability as beginning later, in January 1998 – after her requests for accommodation were denied. Thus, the jury had sufficient support to deem Blockel a "qualified individual with a handicap."

## B. Retaliation

Next, J.C. Penney claims that the jury erred in finding for Blockel on her retaliation claim. Under Massachusetts law, it is unlawful to "coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or

-16-

protected" by the Massachusetts anti-discrimination statute. Mass. Gen. Laws ch. 151B, §4(4A). To succeed in a retaliation claim, "'a plaintiff must establish the basic fact that he was subjected to an adverse employment action because of his protected activity.'" Pontremoli v. Spaulding Rehab. Hosp., 747 N.E.2d 1261, 1264 (Mass. App. Ct. 2001)(quoting Lewis v. Gillette, Co., 22 F.3d 22, 24 (1st Cir. 1994)).

J.C. Penney argues that Blockel did not prove a link between a protected activity and any adverse action. The company also contends that Rainero and Seberger had no knowledge of the reduction in force when they completed Blockel's evaluation.

Blockel persuasively marshals the facts in support of the jury verdict. Relying on testimony indicating that Seberger was likely aware of the planned reduction in force by the time Blockel's evaluation was finalized and that the evaluation was based on faulty numbers, the jury could have inferred that Blockel suffered an adverse action. There was evidence that slipping from a "2" to a "3" rating would, even in the absence of the reduction in force, reduce any annual pay increase. Moreover, in this case, the "3" rating did in fact result in her termination. The same evidence also could have led the jury to conclude that the adverse action was based on Blockel's protected activity of repeatedly seeking an accommodation.

-17-

Ultimately, the determination of whether or not retaliation occurred within the meaning of the statute was a factual determination within the province of the fact finder. See, e.g., Lipchitz v. Raytheon Co., 751 N.E.2d 360, 366 (Mass. 2001) (stating that whether discrimination occurred, when the issue is "raised by the parties' conflicting evidence as to the defendant's motive, is not for a court to decide on the basis of briefs and transcripts, but is for the fact finder after weighing the circumstantial evidence and assessing the credibility of the witnesses" (internal citations omitted)).

## C. Back Pay Award

Third, J.C. Penney charges that the jury's award of $128,700 in back pay to Blockel was unsupported. J.C. Penney alleges that Blockel's claim that she was totally disabled and could not take part in any meaningful employment as of January 8, 1998, precludes her from receiving a back pay award. The company also suggests that even if Blockel were eligible for lost wages, she failed to fulfill her duty to mitigate her damages by seeking alternative employment.

The Massachusetts discrimination statute provides for actual damages, and the statute is to be construed liberally. Mass. Gen. Laws ch. 151B, § 9. Compensatory damages may include those that make "the aggrieved party whole, . . . including those which are the natural and probable consequences . . . of the illegal

conduct." Conway v. Electro Switch Corp., 523 N.E.2d 255, 257 (Mass. 1988) (internal quotations omitted). When an employee's total disability is caused by an employer's failure to reasonably accommodate her, the loss of employment can be an element of special damages that the jury may consider in fashioning a remedy for the failure to accommodate. See, e.g., Langon v. Dep't of Health & Human Servs., 959 F.2d 1053, 1061-62 (D.C. Cir. 1992).

In this case, the jury could have found that Blockel's total disability resulted from J.C. Penney's violation of its statutory duties. Given such a finding, Blockel was entitled to the pay she would have received but for J.C. Penney's mistreatment.

As for Blockel's duty to mitigate, J.C. Penney is correct that Blockel was required to mitigate her damages to the extent possible. See Conway, 523 N.E.2d at 257. Nevertheless, Blockel was entitled to recover what she would have been paid had she not become disabled, reduced by the amount of any disability benefits. See Troy v. Bay State Computer Group, Inc., 141 F.3d 378, 382 (1st Cir. 1998). Moreover, Blockel mitigated her damages by obtaining J.C. Penney long-term disability and Social Security disability benefits. J.C. Penney offered no evidence that there were employment opportunities available to Blockel. Thus, there was no discernible error in the jury's back pay award to Blockel.

## D. __Punitive Damages__

J.C. Penney's final argument regarding the court's denial of its motion for judgment notwithstanding the verdict is that the jury's punitive damages award of $350,000 should be set aside as insupportable.[3]  J.C. Penney also claims error in the court's instructions on punitive damages.

The Massachusetts anti-discrimination statute authorizes an award of punitive damages, see Mass. Gen. Laws ch. 151B, § 9, and such damages may be awarded "where a defendant's conduct warrants condemnation and deterrence."  Bain v. City of Springfield, 678 N.E.2d 155, 162 (Mass.  1997).  In an employment discrimination case, punitive damages may be granted for "outrageous" conduct, where the defendant displays "'evil motive or . . . reckless indifference to the rights of others.'"  Dartt v. Browning-Ferris Indus., Inc., 691 N.E.2d 526, 537 (Mass. 1998) (quoting Restatement (Second) of Torts § 908(2) (1979)).  Juries have "wide discretion" to determine the amount of punitive damages, and trial courts have similar discretion to affirm the jury's award of damages.  See

---

[3]J.C. Penney makes the additional argument that the court erred by refusing to grant it a reasonable care defense instruction pursuant to Burlington Industries v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  Because J.C. Penney did not raise this argument in its Rule 50(b) motion, we do not address it but note that Massachusetts appears not to have adopted a reasonable care defense.  See Myrick v. GTE Main Street Inc., 73 F. Supp. 2d 94 (D. Mass. 1999)(citing College-Town v. Mass. Comm'n Against Discrimination, 508 N.E.2d 587 (Mass. 1987)).

McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 306 (1st Cir. 1998) (citing Fishman v. Clancy, 763 F.2d 485, 489-90 (1st Cir. 1985)).

J.C. Penney contends that the court's instructions led the jury astray by not requiring it to make specific findings as to whether J.C. Penney was willful or reckless. It suggests that the court's instructions implied to the jury that punitive damages were a foregone conclusion by focusing on the amount rather than whether they would be appropriate.

A review of the record reveals that the judge's instructions were consistent with Massachusetts law and did not in any way presuppose an award of punitive damages. The judge instructed the jury that if it found that Blockel proved by a preponderance of the evidence that J.C. Penney discriminated against her with malice or reckless indifference to her rights, it was authorized but not required to award punitive damages. The court reiterated: "In this case, as I said, you may award punitive damages only if you find that J.C. Penney Company, Inc., engaged in discriminatory practice or practices with malice or reckless indifference to the rights of Ms. Blockel . . . ." The judge went on to define the terms "malice" and "recklessness" and advise the jury on the factors to be considered in the event of an award.

With regard to the propriety of the punitive damages award, among the pieces of evidence upon which the jury could reasonably

have relied were the following: Rainero's knowledge that Blockel's doctor felt her health would be at risk if she were not granted an accommodation, her denials of Blockel's requests despite her training in personnel management and reasonable accommodation of disabilities, and her possible motivation to deny Blockel's accommodation requests because Blockel's performance would reflect on her own.

## IV. <u>Prejudgment Interest</u>

Finally, we reach the sole issue raised in Blockel's cross-appeal. Blockel contends that the district court erred in refusing to award her prejudgement interest for the period during which her claims were pending before the MCAD.

State law customarily governs prejudgment interest determinations on state law claims. <u>See</u> <u>Conetta</u> v. <u>Nat'l Hair Care Ctrs., Inc.</u>, 236 F.3d 67, 77 (1st Cir. 2001). Because this is a question of interpretation of a Massachusetts statute, we review the issue de novo. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Rostoff</u>, 164 F.3d 63, 66 (1st Cir. 1999).

Blockel raises an interesting issue: whether an individual who files a claim before the MCAD, but later files a claim in court, may obtain prejudgment interest for both periods -- that during which the claim was pending before the MCAD and that during which the claim was pending in court.

Under the Massachusetts statutory scheme, employees claiming discrimination must first file a complaint with the MCAD. See Mass. Gen. Laws ch. 151B, § 5. Blockel filed her complaint with the MCAD in April 1998. Two years later, in April 2000, the MCAD determined that probable cause existed. Blockel promptly requested certification to public hearing, the next step in the process. See Mass. Regs. Code tit. 804, § 1.20(3). She repeatedly urged the MCAD to certify before November 12, 2000, the date on which the statute of limitations would expire and bar her from bringing her statutory claims in court. See Mass. Gen. Laws ch. 151B, § 9.

At an October 5, 2000, certification meeting, a representative of the MCAD suggested the possibility of a tolling agreement between the parties that would allow the case to remain at the MCAD. According to a letter from Blockel to the MCAD, J.C. Penney refused to enter a tolling agreement. As the statute of limitations deadline became imminent, Blockel filed suit in state court. J.C. Penney subsequently removed the case to federal district court.

After the jury verdict in her favor, the district court awarded Blockel prejudgment interest on the back pay and compensatory damage awards at twelve percent per year, the rate mandated by state law, see Mass. Gen. Laws ch. 231, § 6B, beginning from the date on which Blockel filed her claim in state court. The court denied Blockel's request that prejudgment interest also be

awarded for the period during which her claim was pending before the MCAD.

Massachusetts law states clearly that prejudgment interest is to be awarded from the "commencement of the action." Mass. Gen. Laws ch. 231, § 6B (stating that "there shall be added by the clerk of the court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action"); see also Fontaine v. Ebtec Corp., 613 N.E.2d 881, 892 (Mass. 1993) (reiterating that "the plaintiff is entitled to prejudgment interest on his compensatory damages from the commencement of the action").[4] Nevertheless, the question remains whether "commencement of the action" can be construed to mean the time at which Blockel filed her claim with the MCAD.

Massachusetts law does not explicitly answer this question. Although many Massachusetts cases consider various issues regarding prejudgment interest, the parties have cited, and we have found,

---

[4]Although § 6B governs "damages for personal injuries," Blockel makes the argument that her claims did not fall within § 6B, but rather within § 6H, covering actions in which damages are awarded but interest is not otherwise provided by law. This argument does not advance her cause. First, § 6H refers back to § 6B to determine the rate of prejudgment interest and also assigns the date of origin of interest to be the "date of commencement of the action." Second, § 6B appears intended to cover a broad variety of claims alleging injury to person or property. See, e.g., Shawmut Cmty. Bank, N.A. v. Zagami, 586 N.E.2d 962, 966 (Mass. 1992) (stating that "the language of [ch. 231, § 6B] does not refer to any specific tort but rather applies in general to a wide range of actions causing injury to the person or to property" and noting that § 6B had been applied in cases ranging from nuisance to breach of duty of fair representation).

none directly on point.  See, e.g., Gill v. North Shore Radiological Assoc., 430 N.E.2d 1210, 1212 (Mass. 1982) (holding that "commencement of the action" should be construed to allow interest dating back to the date on which the original complaint in the action was filed, regardless of the fact that defendant was joined at a later date); Bernier v. Boston Edison Co., 403 N.E.2d 391, 401 (Mass. 1980) (stating that "the statute seems to yield to the belief that a plaintiff should not be favored with interest until he has complained to the court of the injury"); McCarthy v. The Ground Round, Inc., 1998 Mass. Super. LEXIS 552, at *4 (Mass. Super. Ct. Oct. 15, 1998) (holding that when a case was filed in federal court but voluntarily dismissed so that the claim could be refiled in state court, the victorious plaintiff was entitled to prejudgment interest from the date that the action commenced in federal court).

None of the cases indicate that interest may accrue from the date that a pre-court agency action is filed.  In fact, all operate within the context of various court proceedings.  In our view, although the term "commencement of the action" is capable of the interpretation argued by Blockel, it seems to us to fit more comfortably within the context of court proceedings.[5]  We are also

[5]Courts have variously defined "action" as: "a lawful demand of one's right in a court of justice," Smith-Webster Co. v. John, 259 F. 549, 551 (3d Cir. 1919); "the pursuit of a right in court, without regard to the form of procedure," Ginzberg v. Wyman, 172 N.E. 614, 615 (Mass. 1930); and "[j]udicial remedy for the enforcement or protection of a right," White v. White, 186 N.E.

-25-

mindful of the fact that the establishment of state remedies and penalties involves the kind of line drawing not usually congenial to federal court proceedings.

Blockel relies on the concept that interest "may be used to make the aggrieved party whole." Conway, 523 N.E.2d at 258 n.7 (citing Bournewood Hosp., Inc. v. Mass. Comm'n Against Discrimination, 358 N.E.2d 235, 242 (Mass. 1976)). As the district court pointed out, however, Conway did not address the particular issue at hand, but instead stands for the basic proposition that plaintiffs are entitled to prejudgment interest on back pay awards from the date of the filing of the complaint.

Blockel also points out that the MCAD routinely awards interest on cases it brings to conclusion in favor of plaintiffs. Nevertheless, in so doing, it does not rely on the authority of Mass. Gen. Laws ch. 231, § 6. Although the MCAD may well look to that provision for guidance in calculating the rate of prejudgment interest, it ultimately derives its authority from the statute governing its own processes. See College-Town, 508 N.E.2d at 595 (noting that the MCAD "is given broad authority to remedy discrimination, and that authority extends to awarding interest to make victims whole for their damages," citing Mass. Gen. Laws ch. 151B, § 5). Finally, even though Blockel makes a compelling argument that principles of equity favor her, the fact remains that

---

349, 351 (Ind. Ct. App. 1933) (internal citation omitted).

-26-

her claim was brought under a finely tuned Massachusetts statute and was not of an equitable nature.

In the end, we can see no indication in Massachusetts statutory or case law that when a claim is removed from the MCAD's jurisdiction and then proceeds in a court action that prejudgment interest could be awarded for the time the case was pending before the MCAD. Thus, we perceive no error of law in the district court's ruling.

## V. <u>Conclusion</u>

For the foregoing reasons, the judgment of the district court is **<u>affirmed.</u>**