LING ZHANG & another[1] *vs.* MASSACHUSETTS INSTITUTE OF
TECHNOLOGY.

No. 96-P-1588.

Middlesex. May 12, 1998. - April 5, 1999.

Present: ARMSTRONG, PERRETTA, & SPINA, JJ.

*Practice, Civil,* Summary judgment. *Anti-Discrimination Law,* Burden of
proof, Prima facie case, Termination of employment, Sex, Race. *Employ-
ment,* Discrimination, Termination. *Contract,* Misrepresentation. *Husband
and Wife,* Consortium.

In a claim alleging employment discrimination based on disparate treatment
    on account of gender, the plaintiff presented sufficient evidence on the
    defendant's motion for summary judgment to show a prima facie case of
    discrimination because of her pregnancy and the existence of disputed
    questions of fact as to whether her employer's proffered reasons advanced
    to support its termination of the plaintiff were pretexts. [601-604]
In a claim alleging discrimination in employment based on race, the plaintiff's
    proffer on the defendant's motion for summary judgment was insufficient
    to show a prima facie case of race discrimination, and the judge correctly
    ordered summary judgment in favor of the defendant. [604-605]
A Superior Court judge correctly granted summary judgment in favor of the
    defendant on a claim for misrepresentation [605-606], and a claim for loss
    of consortium [606-607], where the plaintiffs had no reasonable expecta-
    tion of proving an essential element of those claims.

CIVIL ACTION commenced in the Superior Court Department on
May 22, 1995.

The case was heard by *Hiller B. Zobel,* J., on a motion for
summary judgment.

*Celina Gerbic* for the plaintiffs.
*Elizabeth P. Seaman* for the defendant.

PERRETTA, J. This appeal is from a grant of summary judg-
ment in favor of the defendant, Massachusetts Institute of
Technology (MIT), on a complaint brought by the plaintiff,

---

[1]James Cen.

Ling Zhang, alleging employment discrimination (gender and race) and misrepresentation; and by her spouse, James Cen, claiming a loss of consortium.[2] Based upon the materials submitted pursuant to Mass.R.Civ.P. 56, 365 Mass. 824 (1974), a Superior Court judge ruled that Zhang's allegations of discrimination were based on no more than speculation that the termination of her employment was the result of her pregnancy and that the term "tar baby" had been made in reference to her situation and not her race. He granted MIT summary judgment on her claim that MIT had misrepresented the duration of her employment on the basis that the materials showed that Zhang knew that she had received a term-appointment which was subject to nonrenewal. The judge did not address Cen's claim for loss of consortium, apparently reasoning that dismissal of Zhang's claims necessarily disposed of his ancillary action. We think that the materials submitted on the motion show genuine disputes of material fact on Zhang's claim of gender discrimination and reverse the judgment with regard to that claim only.

1. *The facts.* This litigation arises out of Zhang's employment position with the Atmospheric Sciences Group (ASG) at the Haystack Observatory (haystack), a MIT research laboratory. We relate the facts as they appear in the plaintiffs' affidavits, deposition transcripts, and exhibits. Although MIT disputes many of the facts asserted by the plaintiffs, "[o]ur review of the grant of summary judgment in favor of the defendant requires us to assume the truth of all the facts set forth in all the materials the plaintiff[s] properly presented to the Superior Court judge, as well as to give [them] the benefit of any favorable inferences that may be drawn from those materials." *Harrison* v. *Boston Financial Data Servs., Inc.*, 37 Mass. App. Ct. 133, 136 (1994). See *Judson* v. *Essex Agric. & Technical Inst.*, 418 Mass. 159, 162 (1994).

In 1992, John C. Foster was an associate director at Haystack, and Zhang was a Ph.D. candidate in physics at Boston College. In May of that year, while attending an American Geophysical Union meeting, Zhang introduced herself to Foster and asked if he was still doing research in the area of plasma convection in the ionosphere, which was the topic of her thesis. Foster informed her that he had an opening at Haystack for someone

---

[2]Zhang voluntarily dismissed her claims for intentional infliction of emotional distress, negligent hiring, retention, and supervision, and violation of G. L. c. 12, §§ 11H and 11I.

with a background in that field. As of that time, Zhang had sent out many resumes in search of a tenure-track teaching position, and she had received one offer from a college in Atlanta, Georgia, at an annual salary of $28,000. Cen was then living and working in Atlanta.

Soon after the conference, Foster invited Zhang to visit Haystack to discuss postdoctoral opportunities. Zhang accepted the invitation and went to Haystack for an interview with Foster. During that interview, she asked him whether the position was a "permanent" or "long-term" one. Foster told Zhang that no one at Haystack had a permanent position, that "we are all under soft money and everybody gets renewed every year depending on funding," and that, in the past, funding had been good. Zhang understood the term "soft money" to mean "money which would come from some government source and it may not always be there." It was also her understanding that a "post-doctoral staff position" was a position for someone with, or soon to obtain, a doctoral degree. As put by her, "It's a category to differentiate someone who is staff without a doctorate degree and someone who is staff with a doctorate degree."[3] Foster also informed Zhang that the annual salary for the position was $35,000. At the conclusion of the interview, he told Zhang that she would be receiving an offer from MIT very shortly.

The offer came in the form of two letters. In the first letter, dated December 16, 1992, the offered position was described as a "temporary, Sponsored Research Staff — Postdoctoral ap-pointment," effective January 1, 1993, through December 31, 1993. The letter further stated that the position was a "temporary full-time position." The second letter, dated December 24, reiter-ated the effective dates of the appointment (January- December, 1993), referred to the position as a "Sponsored Research Staff — Postdoctoral," and made no reference to "temporary." Although Zhang did not like the use of the word "temporary" in the first letter, she did not seek clarification from anyone at MIT for several reasons: the first letter was signed by MIT's personnel officer whereas the second letter, in which the word "temporary" was not used, was signed by MIT's vice-president and dean for research, and Foster had told her that because continued employment was dependent upon funding, no one at

---

[3]Although MIT disputes Zhang's recitation of the substance of her discus-sions with Foster, it accepts her version of the interview for purposes of this appeal.

Haystack had a permanent position and that everyone was on a year-to-year appointment.

Zhang began working at Haystack in January of 1993. On October 29, 1993, she was advised that her "current temporary appointment" had been extended through December 31, 1994. In January of 1994, she received a small, one percent salary increase. Zhang testified at her deposition that although she was not pleased about the amount of the increase, she accepted Foster's explanation in which he praised her work and stated that the budget was very tight. He also told her that because money might also be very tight the following year, her appointment might not be renewed. Zhang stated that she was surprised to learn about the budget situation because Foster had told her during her interview that Haystack's funding history was good.

In late June, 1994, Foster left for a three-month sabbatical in Japan. When he returned to Haystack at the beginning of October, he passed Zhang in the hallways. At this time she was six months pregnant, and her condition was apparent. Foster called a meeting for ASG members for October 6. Zhang stated that the purpose of the October 6 meeting was to address funding issues. Foster announced that funding for 1995 would be level with 1994 and that two new people would be joining ASG. Although Foster named the two individuals, one of whom was a Monica Coakley,[4] and gave a brief statement about where they were coming from, he gave no indication that they were to be replacements for anyone. Zhang knew, however, that two people had left Haystack during 1994.

After the meeting, Zhang approached Foster and told him that her baby was due in January. He congratulated her and asked about her plans. When Zhang stated that she intended to return to work in mid-January, Foster told her that he would have to check his budget for that year, that it was very tight. Zhang responded that if the budget was tight, she would consider an appointment for a term less than one year. In late November, Zhang had another conversation with Foster in which he asked Zhang whether she would consider a short, three-month extension of her appointment. Although surprised, Zhang stated that if that was all the budget could allow, she would take it, that she had recently enrolled in MIT's health insurance plan,

---

[4]In 1994, Coakley was completing her doctoral degree in physics and was qualified in the field of optical ionospheric research.

and that she most likely could find another position at the end of that short-term extension.[5]

On or about December 12, 1994, Zhang was notified that, because of a lack of funding, her appointment would not be extended beyond December 31, 1994. Her position was filled by Coakley.

Cen testified at his deposition that Zhang's employment situation caused stress in their lives and that they would have disagreements over trifling matters two or three times a week.

2. *The discrimination claim.* In examining Zhang's discrimination claims based upon disparate treatment, we follow an established three-step analysis. See *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 138 (1976), citing *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802 (1973); *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 441-442, 446 (1995); *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 128 (1997). Zhang must first make a prima facie case of gender and racial discrimination. Based upon that evidence, discrimination will be presumed, and the burden then shifts to MIT to give a legitimate, nondiscriminatory reason for its hiring decision and to produce evidence to show that the reasons given for that decision were the real reasons. Once that burden is met, the presumption of discrimination dissolves, and the burden again shifts to Zhang who must now show, by a preponderance of the evidence, that the nondiscriminatory reasons given by MIT were not the real reasons for its decision and thus were pretexts. *Blare, supra* at 443.

To make a prima facie case of sex discrimination, a plaintiff must show membership in a protected class, satisfactory job performance, termination, and the hiring of a replacement who possesses similar skills. See *Beal* v. *Selectmen of Hingham*, 419 Mass. 535, 544 (1995). The materials presented on summary judgment show that Zhang has a reasonable expectation of proving each of the four elements of a prima facie case of gender discrimination.

"Asserting a claim based on sex discrimination as a pregnant woman, [Zhang] is a member of a protected group." *White* v. *University of Mass. at Boston*, 410 Mass. 553, 557 (1991). She

---

[5]In mid-November, Zhang had taken steps to enroll in MIT's health insurance plan, effective January 1, 1995.

stated at her deposition that Foster praised her work. During his deposition, Foster testified that while some members of his research staff had higher performance evaluations than Zhang, her work was good. When Zhang's appointment was not renewed, her position was given to a woman possessing similar skills.

To satisfy its burden of production, MIT presented materials to show that Foster had determined not to renew Zhang's appointment before she even became pregnant and that his determination was based upon her low evaluations and reductions in funding. According to an affidavit from Foster, funding was very erratic in 1993 and 1994. In mid-1993, the Air Force Office of Scientific Research (AFOSR) cut back its funding by $20,000. That reduction "directly affected the viability of a post-doc position continuing."[6] In the fall of 1993, Foster met with Haystack's director, Joseph Salah, to review the performance and salary of each ASG employee. At that meeting, Foster told Salah that Zhang had not been as productive as he had hoped and that he did not expect her to complete any significant research project.

Foster and Salah met again in January, 1994, and discussed the effect of the funding cutbacks on the post-doctoral positions. Foster and Salah decided that although there was sufficient funding to cover the second year of Zhang's appointment, she would not be offered a third year at Haystack after 1994. Foster stated that that decision was based upon both the funding situation and his "low evaluation" of Zhang's accomplishments. He then informed Zhang that, because of funding, her employment would end on December 31, 1994.

In the meantime, according to Foster's affidavit, the National Science Foundation renewed its funding support in June of 1994. That money would allow ASG to fill the position that would be open upon the termination of Zhang's employment. Because he was due to leave for Japan on sabbatical, Foster asked members of ASG to look for someone in the research area of optical ionospheric research.

There is an affidavit from an ASG research scientist in which he states that, in late June, he told Monica Coakley about an

---

[6]During this period, 1993-1994, a project funded by the National Science Foundation also expired. Foster laid off one technical support employee in June of 1994 and waited until 1995 to replace one of two research scientists who had left.

upcoming postdoctoral position, that she visited Haystack over the Labor Day weekend, and that she told the affiant that she would need a prompt response from MIT.

Again reading Foster's affidavit, we are informed that one of the first things he did upon his return to Haystack was, on October 5, 1994, offer a postdoctoral position to Coakley and announce her employment, commencing in 1995, at the ASG meeting the next day.

We conclude that the facts set out in MIT's proffer are sufficient to satisfy its burden of production to show that its decision to terminate Zhang was based on nondiscriminatory reasons. Its proffer was, therefore, sufficient to rebut Zhang's prima facie case. See *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. at 128. That being so, the question now is whether the materials submitted on the motion for summary judgment are sufficient to show that the reasons advanced by MIT were a pretext.

Although Foster states that he informed Zhang in January of 1994 that her employment would end on December 31, 1994, because of a lack of funding, Zhang states that, at that time, Foster praised her work and told her only that funding was tight. While Foster set out in his affidavit that he had given Zhang's work a "low evaluation," he testified at his deposition that her work performance was, like that of eight other research staff members, good. Because there were other research staff members who had received higher evaluations, Zhang's was "low." Further, Foster knew of the renewed funding from the National Science Foundation before he left on sabbatical and before he knew of Monica Coakley. Upon his return from sabbatical, he saw that Zhang was pregnant; he offered a postdoctoral position to a candidate who had been found and recommended by someone within the ASG group and whom, from all that appears, he had not even met; he announced level funding for 1995; and he thereafter informed Zhang that funding was tight but that he would look into whether she could be given a short-term, three-month extension of her employment without also telling her that Coakley had been appointed to her (Zhang's) postdoctoral position. Zhang was not offered a short-term appointment because, as shown on copies of electronic mail messages, Salah's assistant, Alan Blackburn, took the position that Zhang knew from the outset that her appointment was limited to two years and that a short-term extension would open

the door for Zhang to claim generous health care benefits and maternity leave from MIT.

Putting aside, as we must, issues of credibility and the weight of the evidence, see *Attorney Gen.* v. *Brown,* 400 Mass. 826, 832 (1987), and bearing in mind that summary judgment is disfavored in disputes involving a party's state of mind, motive, or intent, see *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. at 439, we conclude that Zhang's proffer shows a prima facie case of discrimination on account of her pregnancy and presents disputed questions of fact whether the reasons advanced by MIT, the "low" evaluation of her work performance viewed in light of reduced funding, were pretexts.

We do not, however, reach a similar conclusion on her claim of race discrimination. A claim of race discrimination brought under G. L. c. 151B, § 4(1), follows the same analysis as that applied to a gender-based claim. See *Lewis* v. *Area II Homecare for Senior Citizens, Inc.,* 397 Mass. 761, 765-766 (1986). That is, to make her prima facie case, Zhang must show membership in a racial minority, acceptable job performance, termination of her employment, and replacement with a similarly qualified individual. See *McKenzie* v. *Brigham & Women's Hosp.,* 405 Mass. 432, 434-435 (1989). Evidence of the employer's general practice and policies concerning the employment of racial minorities, the treatment of employees of different race, and the specific treatment of the plaintiff while employed are all relevant to show racial discrimination. See *McDonnell Douglas Corp.* v. *Green,* 411 U.S. at 804-805; *Lewis* v. *Area II Homecare for Senior Citizens, Inc.,* 397 Mass. at 767; *McKenzie* v. *Brigham & Women's Hosp.,* 405 Mass. at 437.

Zhang's claim of race discrimination rests entirely upon the electronic mail messages sent by Blackburn to Foster and the personnel director in which he twice used the term "tar baby," words generally understood to be either a derogatory reference to black Americans or a difficult or sticky problem. See IV Oxford English Dictionary Supplement (1986). For purposes of this decision, we acknowledge that the term "tar baby" is extremely offensive to African-Americans. Nonetheless, in view of the undisputed facts that Zhang is not a member of the minority who rightfully take offense from that term, that Blackburn viewed Zhang's request for a short-term extension of her employment as an unfair and calculated attempt to obtain MIT's generous health insurance and maternity leave benefits, and that

MIT has a history of employing minorities, including Asians, we agree with the Superior Court judge's conclusion that Zhang's proffer was insufficient to show a prima facie case of race discrimination. See *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 314 n.7 (1993) (isolated or ambiguous remark, standing alone, is insufficient to prove discriminatory intent). See also *Tardanico* v. *Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 450 (1996).

3. *The misrepresentation claim.* This claim is based upon Foster's statements to Zhang during her meeting with him at Haystack in May, 1992. Zhang testified at her deposition that Foster, in response to her inquiries concerning the nature and tenure of her possible position at Haystack, told her that the position was a regular staff and not a postdoctoral position, that no one at Haystack had a permanent position, that employment depended upon funding, that everybody gets renewed every year depending upon funding, and that, in the past, funding had been good. Zhang argues that, because these statements contradict MIT's subsequent representations that her appointment was to a postdoctoral position of limited duration (two years), she has shown the requisite falsity, materiality, and purpose (inducement) of Foster's statements in May of 1992 as well as her detrimental reliance upon them.[7] See *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 77 (1991).

As earlier noted, MIT does not dispute, for purposes of this appeal, Zhang's version of her 1992 interview with Foster. See note 3, *supra.* Construing Foster's statements in a light most favorable to Zhang, we think that they could be construed reasonably as a representation by Foster that her appointment would be renewed from year to year so long as funds were available. "Massachusetts law clearly states that statements of present intention as to future conduct may be the basis for a fraud action if . . . the statements misrepresent the *actual intention* of the speaker and were relied upon by the recipient to his damage. *Barrett Assocs., Inc.* v. *Aronson*, 346 Mass. 150, 152 (1963). *Feldman* v. *Witmark*, 254 Mass. 480, 481-482 (1926).

---

[7]The Superior Court judge granted summary judgment on this count of the complaint on the basis that the letters Zhang received from MIT on December 16 and 24, 1992, established that she had received a "term appointment, subject to renewal and, necessarily, subject to non-renewal." This resolution does not address the gist of her claim, that is, Foster's earlier statements concerning renewal and funding.

See also Restatement (Second) of Torts § 530 (1977)." (Emphasis added; footnote omitted.) *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 709-710 (1990).

All that Zhang presented to show that in 1992 Foster had no intention of renewing her appointment from year to year is his decision in 1994 to use available funding for 1995 to appoint someone else to her position. On this proffer, a jury would have no basis for concluding that in May, 1992, Foster misrepresented his intention to renew Zhang's appointment should funding be available. See Restatement (Second) of Torts § 530(1) comment d (1977): "The intention that is necessary to make the rule stated in this Section applicable is the intention of the promisor when the agreement was entered into. The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into."

Because MIT demonstrated that Zhang had no reasonable expectation of proving an essential element of her claim for misrepresentation, it was entitled to summary judgment on that count of the complaint. See *Judson* v. *Essex Agric. & Technical Inst.*, 418 Mass. 159, 162 (1994), quoting from *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

4. *The loss of consortium claim.* It follows from what we have said that any ancillary action Cen might have for loss of consortium must be based upon Zhang's surviving allegation of gender discrimination. Relying upon *Dalis* v. *Buyer Advertising, Inc.*, 418 Mass. 220, 226 (1994) (gender discrimination "has historical connections to common law tort and contract claims"), Cen argues that an action under G. L. c. 151B sounds in "tort" and that his claim must be reinstated. MIT cites Federal authority for the proposition that a claim for loss of consortium cannot be brought ancillary to a statutory claim for discrimination. See *Tauriac* v. *Polaroid Corp.*, 716 F. Supp. 672, 673-674 (D. Mass. 1989). Accord *Staffier* v. *Sandoz Pharmaceuticals Corp.*, 888 F. Supp. 287, 293 (D. Mass. 1995).

We need not decide this question of law because Cen's claim fails as matter of fact. His proffer is totally lacking in any showing that a discriminatory act against Zhang, even if tor-

tious, caused her any illness or injury which, in turn, resulted in his loss of her society, companionship, or sexual availability. "Any recovery for loss of consortium by [him] here would require proof of a tortious act that caused injury to [his wife]. See Prosser & Keeton, Torts § 125 (5th ed. 1984). See *Diaz* v. *Eli Lilly & Co.*, 364 Mass. 153, 163-167 (1973); *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 146 (1976)." *Mouradian* v. *General Elec. Co.*, 23 Mass. App. Ct. 538, 544 (1987). In her deposition, Zhang never identified any illness or injury suffered by her as a result of MIT's action. Further, Cen made no showing of any loss of consortium. The only complaints voiced by him in his deposition were that, because of Zhang's unemployment, she was under stress, he began to feel a greater responsibility "to maintain the normal living," and he and she would bicker two or three times a week. On this proffer, we conclude that MIT has demonstrated that Cen has no reasonable expectation of proving any of the essential elements of his claim for loss of consortium.

5. *Conclusion.* The judgment is affirmed on those counts of the complaint which allege race discrimination, misrepresentation, and loss of consortium. As to the claim of gender discrimination, the judgment is reversed and that matter is remanded to the Superior Court for further proceedings.

*So ordered.*