Burnes, J.
INTRODUCTION
The plaintiff, Augustine Ahanon (“Ahanon”), sued Cerebral Palsy of Massachusetts (“Cerebral Palsy”), Linda McWalter (“McWalter”) and Larry Spencer (“Spencer”) resulting from his alleged wrongful termination from a bookkeeping position with Cerebral Palsy. Ahanon claims that he was discriminated against based on race (African-American), national origin (Nigerian) and handicap (semi-paralysis of his legs) under G.L.c. 15 IB; that the defendants retaliated *67 against him also in violation of G.L.c. 151B and that defendant McWalter wrongfully interfered with his contractual relations. The defendants have moved for summary judgment on all claims. Ahanon does not have sufficient proof on the discrimination claims and they are, in any case, all barred by the statute of limitations; any of Ahanon’s protected activity has no causal connection to the adverse employment decision, defeating a retaliation claim; and the facts are insufficient to sustain a claim of wrongful interference with contractual relations. For these reasons as more fully set out in this memorandum of decision, the motion for summary judgment is ALLOWED.
BACKGROUND
From the parties’ filings, in the light most favorable to the non-moving parly, for purposes of this motion, these are the undisputed material facts. In September of 1999, Ahanon applied for a position with Cerebral Palsy. As part of the application process, Ahanon filled out a form in which he indicated that he had not been convicted of a felony in the last seven years. Spencer interviewed Ahanon, reviewed his resume and employment application, and hired him with the approval of Thomas Zukauskas (“Zukauskas”), Executive Director of Cerebral Palsy. At the time of this meeting, Spencer was aware that Ahanon was African-American, walked using an aid, and based on information in his application materials, was of Nigerian descent. Cerebral Palsy hired Ahanon on September 29, 1999 as an at-will employee with the title of bookkeeper in the fiscal intermediary department.
At some point after his hiring, as a result of a criminal background check, Zukauskas learned of Ahanon’s felony conviction. Zukauskas confronted Ahanon regarding the inconsistency on his employment application. Ahanon explained that he was under the impression that the crime for which he was convicted was a misdemeanor, not a felony. Zukauskas allowed Ahanon to remain employed with Cerebral Palsy, but cautioned him that any further infractions would be taken very seriously.
Ahanon’s job functions initially required him to reconcile bank statements pertaining to disbursements for payroll. For the first year of his employment, Ahanon received satisfactoiy reviews of his work. In 2000, an automation process was introduced which performed Ahanon’s duties. As a result, Ahanon’s responsibilities changed, although he retained the same title. Ahanon’s new position began at some time during 2000, and required him to process payroll information for care providers who provided services to consumers (people with cerebral palsy who are served by the agency). Ahanon’s occupational responsibilities included: adding up and checking time sheets, entering payroll into computer software, alphabetizing and filing form W-4s and other tax forms, alphabetizing and filing time sheets, and on certain scheduled days, answering phones.
On or about April 24, 2000, Zukauskas assisted Ahanon in successfully applying to the Ciiy of Quincy in obtaining a handicapped parking space near the Cerebral Palsy building. According to Ahanon, Zukauskas assisted in this application so he could have easier egress from his own parking space by moving Ahanon’s space to a different location.
During the summer of2000, McWalter told Ahanon that she was going to get him fired. Ahanon expressed his concern over this statement to Spencer, who took no action. Ahanon reiterated his concern on numerous occasions.
On or about June 5, 2000, someone placed an anonymous note on Ahanon’s desk. The note read, “6-5-00. Employees are allowed one (1) hour for lunch!” It is alleged that Ahanon confronted co-worker Donna Greene about the note, who stated, “I am not the one who wants you out of here because you are black. I don’t care if you are black, red, green, or whatever.” Greene provided a handwriting sample to demonstrate that she did not write the note. On or about July 14, 2000, another note appeared on his desk which read, “2nd Warning. CP’s lunch is one (1) hour long!! 7-14-00.” Ahanon again approached Greene, who indicated that McWalter wrote the note.
At some point in 2000, someone put a facsimile on Ahanon’s desk. The facsimile was ostensibly some form of scam in which a party, pretending to represent a bank, solicits people to get them to divulge their bank account numbers. The fax contained a letterhead that indicated it was from a financial institution in Nigeria. On the bottom of the fax, the handwritten words “eat shit” appear. Spencer concedes that the words appear to be in his handwriting. Ahanon contends that Spencer admitted placing the note on his desk and stated that he did so because Ahanon is Nigerian and “all Nigerians should eat shit.”
In late 2000, McWalter questioned Ahanon about a time sheet that was not processed. Ahanon explained that the time sheet was received by fax late in the day. Towards the end of 2001, McWalter questioned Ahanon regarding a payment error on a time sheet. Also, there was apparently some disagreement concerning the stapling of two time sheets. There is no record that Ahanon was disciplined for any of these alleged incidents.
On or about January 18, 2001, Ahanon did not have work and took on a project of a co-worker to provide assistance. It is disputed whether this project was completed. The next day, McWalter asked Ahanon to write down what he had worked on the prior day. As a result of this incident, both parties met with Spencer. At this time, Ahanon complained to Spencer that he was concerned that McWalter wanted to fire him based on his race or handicapped status.
At a time unknown, McWalter and Ahanon had a dispute over a method of filing tax forms. During this confrontation, Ahanon started screaming at McWalter. *68 This incident was witnessed by numerous co-workers. Ahanon denies that this “blow up” occurred.
At some point in 2001, Spencer had a conversation with co-workers in which he stated that some of his neighbors do not feel comfortable having black people in their homes. Ahanon was present for this conversation. Spencer participates in a summer program in which he hosts inner city minority children in his home. Spencer says that, while discussing the program with one of his neighbors, the neighbor made the aforementioned comment. Spencer also claims that when telling the story he voiced his contempt for his neighbor’s comments. Ahanon only admits to hearing the statement.
Ahanon also contends that on February 14, 2001, Spencer said, in Ahanon’s presence, something to the effect “let’s go get some niggers.” Again, Spencer claims that this phrase was taken out of context. Spencer asserts that he was relating a story to a co-worker about an incident that took place while Spencer was in the army. Spencer says that a member of his unit uttered this statement, and then as a result of Spencer’s complaints to superiors, that soldier was transferred to another unit. Ahanon claims to have no recollection that Spencer qualified this statement in this manner.
On October 5, 2001, Spencer announced that Mc-Walter was promoted to the position of payroll supervisor, and as such, McWalter would be Ahanon’s direct supervisor. Ahanon maintains that at all times during his employment, he perceived Spencer as his direct supervisor. As part of her duties, McWalter was required to review time sheets processed by the bookkeepers and assess their productivity. To fulfill this duty, McWalter claims to have maintained handwritten statistical logs of the performance of the employees she supervises. These logs are unavailable at this time.
On December 11, 2001, and December 12, 2001, McWalter asked Ahanon to alphabetize various tax packages if he had some down-time. On December 12, 2001, McWalter discovered unprocessed time sheets on Ahanon’s desk. Subsequent to this, McWalter had a conversation with Ahanon regarding this incident, and on December 13, 2001, Ahanon received a written warning following this meeting. The warning, in brief, stated that Ahanon had failed to perform his job functions. McWalter discussed this warning with Spencer, who invited Ahanon to respond in writing. Ahanon offered no written response.
At some point during Ahanon’s employment, Cerebral Palsy began to track formally the productivity of bookkeepers. According to the pleadings, Ahanon’s productivity was below other bookkeepers and lower than he had produced in the past. Ahanon claims that he is unaware of how his productivity numbers measured to his colleagues.
On January 9, 2002, McWalter assigned Ahanon a project which involved alphabetizing approximately 100-200 tax forms. On January 14, 2002, McWalter spoke to Ahanon concerning his failure to complete the assigned task. On that same day, Spencer terminated Ahanon as an employee for Cerebral Palsy. At that time he was not offered an explanation as to the reason for his termination. Ahanon alleges that he was fired for reasons proscribed in G.L.c. 15 IB. The defendant contends that Ahanon was fired for low productivity, failure to complete the alphabetizing task, and the “blow up” incident with McWalter.
Ahanon filed a charge of discrimination with the Massachusetts Commission Against Discrimination (“MCAD”) on February 27, 2002. Ahanon alleged that he was discriminated on the basis of race, handicap, national origin, and gender. Named as defendants to this action were Cerebral Palsy, Spencer, and McW-alter. The defendants submitted a position statement on May 10, 2002. Subsequently, Ahanon filed this lawsuit in Superior Court on May 29, 2003.
The defendants submit that there were three other bookkeepers recommended for termination by Spencer for low productivity.[2] Two were terminated and one resigned before she was discharged. All three employees are white and non-disabled.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.RCiv.P. 56(c); Cassessov. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the movant to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); KourouvaciLis v. General Motors Corp., 410 Mass. 706, 716 (1991).
In Massachusetts, “[sjummaiy judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment.” Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 439 (1995). Discrimination is usually a question of fact. Id. See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 572-73 (1985). There are instances, however, where summary judgment is appropriate. Blare, 419 Mass, at 440. Where the defendant’s motion for summary judgment demonstrates that the plaintiff s evidence of intent, motive or state of mind is insufficient to support a judgment in his or her favor, the court may allow the defendant’s motion. Id. See also Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127 (1997); Brunner v. Stone & Webster Engineering, 413 Mass. 698, 703 (1992).
*69 At summary judgment, one begins the analysis of a discrimination case by considering whether a plaintiff has set out a prima facie case. See, e.g., Blare, 419 Mass, at 440-46. The plaintiff must show that he is a member of a protected class, that he was performing his job at an acceptable level, that he was terminated, and that he was replaced by a similarly qualified individual. Id.; Weber v. Community Team Work, Inc., 434 Mass. 761, 772 (2001).[3]
The employer can rebut the presumption created by the plaintiffs prima facie case by articulating a legitimate, nondiscriminatoiy reason for the adverse employment action. Blare, 419 Mass, at 441-42. “Chapter 151B protects people against unlawful discrimination. It does not protect against all instances of arbitrary action or from poor managerial judgment.” Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 137 (1976). In other words, the reasons tendered by the employer do not need to be good ones, but they will be sufficient to rebut the prima facie case if they are nondiscriminatoiy. Id. at 138-39; Tate v. Department of Mental Health, 419 Mass. 356, 363 (1995); Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 766 (1986). See also Weber v. Community Teamwork, Inc., 434 Mass. 761, 778 (2001). Even if the reason is a poor one, the employer must still offer credible evidence that the reason given is the real reason. Blare, 419 Mass, at 442; Wheelock College, 371 Mass. at 138. The employer does not, however, have to prove the reasons were nondiscriminatoiy. Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116-18 (2000). Providing evidence of legitimate reasons, however, makes it more difficult for the plaintiff to meet the burden of proving discrimination. Id.
Under stage three, the plaintiff may attack the credibility of the legitimate business reasons for the adverse employment action offered by the employer. Id. at 117-18. “A showing that the employer’s reasons are untrue gives rise, therefore, to an inference that the plaintiff was a victim of unlawful discrimination.” Id. at 118. The inference is then taken together with the plaintiffs prima facie case to establish the cause of action under c. 15 IB. Id. While the burden remains with the plaintiff, “the employer may counter the effect of this evidence by showing that, even if his articulated reason for the adverse action is untrue, he had no discriminatoiy intent, or that his action was based on a different, nondiscriminatoiy reason.” Id. Employees are not limited to showing the falsity of the employer’s offered reasons when proving a discrimination case. Id.
At the end of the day, however, to prevail “(o]n a claim of unlawful discrimination, a plaintiff must prove at trial that she is a member of a protected class, she suffered harm as a result of an employer’s adverse employment action, and the employer harbored discrim-inatoiy animus, which was the determinative cause of the adverse action.” Weber v. Community Teamwork, Inc., 434 Mass. 761, 775 (2001); Lipchitz v. Raytheon Co., 434 Mass. 493, 502, 504 (2001); Abramian 432 Mass. at 118. G.L.c. 151B is an anti-discrimination statute, and as such, the plaintiff must prove a discriminatoiy motive for the adverse employment action. Weber, 434 Mass. at 775; Smith College v. Massachusetts Comm'n Against Discrimination 376 Mass. 221, 227-28 (1978). This motive can be inferred based on different treatment of separate groups, id.; by showing that the employer’s acts were deliberate, rather than accidental, Lynn Teachers Union, Local 1037, AFT, AFL-CIO, 406 Mass. 515, 527 (1990); Sarni Original Dry Cleaners, Inc. v. Cooke, 388 Mass 611, 616 (1983); or by inference that the reason given is not the true reason. Abramian, 432 Mass, at 116. Nevertheless, “(t]he plaintiff has the burden of proving the elements of discriminatoiy animus, and that discrimination was the determinative cause of the adverse employment decision . . .” Lipchitz v. Raytheon Co., 434 Mass 493, 495 (2001). See also Weber, 434 Mass, at 776. If the summary judgment record demonstrates that the plaintiff is not going to be able to prove discriminatoiy animus, the court does not have to wait for trial; it may grant summary judgment.[4]
I. Statute of Limitations
In Massachusetts, at the time this claim was made, a party alleging discrimination was required to file a claim with the MCAD within six months of the alleged discriminatoiy event or events. G.L.c. 15 IB, §5; Thomas v. EDI Specialists, Inc., 437 Mass. 536, 541 (2002).[5] The claim must be brought with the MCAD within the limitations period, before one may file a case in the Superior Court. G.L.c. 15 IB, §5; Cuddyer, 434 Mass. at 531. The statute of limitations begins to run once a plaintiff knows or should know that he or she has been the subject of discrimination. Wynn & Wynn PC. v. Massachusetts Comm’n Against Discrimination 431 Mass. 655, 673 (2000); Cuddyer, 434 Mass. at 535.
II. Individual Defendants to Actions Under G.L.c. 15IB
Under G.L.c. 151B, individuals as well as employers can be found liable of violating the anti-discrimination statute. Beaupre v. Cliff Smith & Associates, 50 Mass.App.Ct. 480,490-91 (2000). See also Thomas v. EDI Specialists, Inc., 437 Mass. 536, 538 (2002). The statute makes it unlawful “for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter orto attempt to do so.” G.L.c. 151B, §4(5). Most of the law interpreting this provision of the statute is found in MCAD decisions. It is proper for courts to give deference to administrative inteipretations of statutes in which the legislative policy is laid out in broad terms. College-Town, Div. of Interco, Inc. v. Massachusetts Comm’n. Against Discrimination 400 Mass. 156, 166 (1987). MCAD interpretations of G.L.c. 15 IB are to be accorded such deference. Beaupre, 50 Mass.App.Ct. at 491.
Any parly who commits workplace discrimination in violation of the statute may be found liable. Tunstall v. Acticell H’W Cosmetics, 22 MDLR 284, 2000 *70 Mass.Comm.Discrim. LEXIS 111, 20-21 (2000). In order to be held liable as an individual, however, the parly must have “undertaken some act wholly individual and distinct from, or in furtherance of, the employer’s discriminatory act.” Woodason v. Town of Norton School Committee, 25 MDLR 62, 2003 Mass.Comm.Discrim. LEXIS 17, 7 (2003). The plaintiff must show that the individual defendant intended to assist in intentional conduct that is in violation of a statute. Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 481 (1994); Harmon v. Malden Hospital, 19 MDLR 157, 1997 Mass.Comm.Discrim. LEXIS 40, 4-7 (1997). The defendant must have known of his or her substantial supporting role in an unlawful enterprise, and share the mental state of the principal violator. Id.
Ahanon has failed to produce any evidence that any of the individual defendants acted in a manner separate and distinct from their roles as agents of Cerebral Palsy. First, none of the alleged incidents of discrimination involved the defendant McWalter. Further, the two or three incidents that involved Spencer, even if timely, are insufficient to demonstrate an intent to discriminate against Ahanon in his employment.
Ahanon complains that the individual defendants treated him unfairly in his job at Cerebral Palsy. While this is an unfortunate circumstance if it is true, Ahanon was an at-will employee. Fairness is irrelevant to a claim under c. 151B. To sustain a cause of action against individual defendants under this statute, Ahanon must, but cannot, demonstrate that the parties intentionally discriminated against him.
III. Discrimination Claims A. Handicap
“To establish a prima facie case of unlawful discrimination on the basis of handicap under G.L.c. 151B, §4(16) the plaintiff must present credible evidence that: 1) he is handicapped within the meaning of the statute; 2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; 3) he was terminated or otherwise subject to an adverse action by his employer; and 4) the position he had occupied remained open and the employer sought to fill it.” Dartt v. Browning-Ferris Industries, Inc. (Mass.), 427 Mass. 1, 2 (1998). Ahanon does not need to show that he was terminated solely because of his handicap. Id. He may meet his burden by offering direct or circumstantial evidence. See Wheelock College v. Massachusetts Comm’n Against Discrimination, 371 Mass. 130, 137-38 (1976).
The only incident which mentions Ahanon’s handicap is that in which his employer provided him with a handicapped parking space near his workplace. This cannot, by any stretch of the imagination, be viewed as showing handicap discrimination. Therefore, Ahanon will not be able to sustain this claim. Furthermore, the actions complained of occurred in April 2000, almost two years begore Ahanon filed his charge at the MCAD. This claim is not timely.
B. Race
To establish a prima facie case of race discrimination, Ahanon must establish evidence of: (1) membership in a racial minority; (2) acceptable job performance; (3) termination of employment; (4) replacement with a similar qualified individual. Zhang v. Massachusetts Institute of Technology, 46 Mass.App.Ct. 597, 604 (1999). Evidence of an employer’s general policies and practices concerning employees who are racial minorities is relevant to prove racial discrimination. Id “The most probative means of establishing that the plaintiffs termination was a pretext for racial discrimination is to demonstrate that similarly situated white employees were treated differently.” Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129 (1997); Smith College v. Massachusetts Comm’n Against Discrimination, 376 Mass. 221, 228 (1978).
Ahanon’s claim of racial discrimination stems from two incidents. On or about February 14, 2001, Spencer was relating a story to some fellow co-workers, including Ahanon. Spencer was recounting an incident that took place while he was in the army, in which a member of his combat unit stated to him, “let’s go get some niggers.” Ahanon claims he took great offense to this statement. His claim was not filed with the MCAD, however, until over a year later. This claim is thus barred by the six-month statute of limitations.
Further, while the use of the racial epithet in the workplace by Spencer may demonstrate extremely poor judgment, it is not necessarily discriminatory. Zhang, 46 Mass.App.Ct. at 605; Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). The statement itself is not discriminatory, as it was not made by Ahanon, and was taken out of context. It was merely recounting the hearsay of another party against whom Spencer allegedly displayed his contempt. Ahanon does not deny that the remainder of the conversation took place which explains the content of the statement; he only contends that he does not recall anything else.
Some time in 2001, the other alleged incident occurred when Spencer was telling another story, this one about a neighbor who stated that he did not feel comfortable having black people in his house.[6] Again, this statement and the supporting views are not that of Spencer, but of another. Ahanon does not offer any evidence that he attributed this statement or view to Spencer, even in error. This conversation apparently took place during a discussion with a neighbor, in which Spencer was describing a program, in which he participates, where families in suburban settings host inner city minority youth in their homes during the summer months.
Isolated statements, even if discriminatory, are not sufficient to prove discriminatory animus. Zhang, 46 Mass.App.Ct. at 605. Accordingly, Ahanon will not be able to prove a discriminatory intent. In addition, Ahanon fails to establish that this incident took place *71 within the six-month statute of limitations period, so this claim is also time barred.
C. National Origin
The analysis of a prima facie case of discrimination based on national origin is the same as it is for race under G.L.c. 15IB. G.L.c. 15IB, §4(1); Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116(2000). The only alleged incident of discrimination as it pertains to national origin took place some time in 2000. The alleged discriminatory act arose out of a fax from a Nigerian bank that was part of some sort of fraud. The words “eat shit” were written on the bottom of the fax, and this document allegedly found its way to Ahanon’s desk. When Ahanon confronted Spencer about the fax, he allegedly replied that, “all Nigerians should eat shit.”
It is hotly contested whether this incident ever took place, but assuming it did, the one incident is not enough to establish discriminatory intent. The degree of an incident may be a factor, but, again, an “isolated or ambiguous remark, standing alone, is insufficient to prove discriminatory intent.” Zhang, 46 Mass.App.Ct. at 605.[7]Therefore, this isolated incident does not meet the burden of a prima facie case of discrimination based on national origin.
The claim concerning national origin is also time barred. The one incident allegedly took place sometime in 2000. Ahanon did not file his claim with the MCAD until February of 2002; it was, therefore, not filed within the six-month statute of limitations.
IV. Retaliation
The section of Chapter 15 IB on retaliation provides that it shall be unlawful for an employer “to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.” G.L.c. 15 IB, §4(4).
To establish a prima facie case of retaliation, the plaintiff must show he: (1) engaged in protected conduct; (2) suffered some adverse action; and (3) a “causal connection existed between the protected conduct and the adverse action.” Mole v. University of Massachusetts, 442 Mass. 582, 591-92 (2004), quoting Mesnick v. General Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991). See also MacCormack v. Boston Edison Co., 423 Mass. 652, 662 (1996) (holding that an employee must establish a causal connection between the complaint of discrimination and retaliation).
An action for wrongful discrimination and a retaliation claim are two separate and distinct causes of action. Abramian, 432 Mass, at 121-22. It is not necessary for the plaintiff to prove there was actual discrimination to prevail on a retaliation claim. Id. at 122. If a claim of discrimination is later found to be without merit, it does not affect a retaliation claim. Mole, 442 Mass, at 592. Once the employee complains of prohibited discriminatory conduct, either informally or with an MCAD claim, it activates the protection of the statute. MacCormack, 423 Mass, at 663.
The federal courts have held that “it [is] unnecessary for a plaintiff to exhaust administrative remedies before she can bring to court a retaliation claim not previously made known to the administrative agency, but arising out of a charge filed earlier with that agency.” Carter v. Comm’ r of Correction, 43 Mass.App.Ct. 212, 218 (1997), quoting Smith v. Mitre Corp., 949 F.Sup. 943, 948 (D.Mass. 1997). The appeals court has examined this rule and declined to comment on it. Carter, 43 Mass.App.Ct. at 218. Massachusetts courts have not addressed this rule, but federal courts have held that the Massachusetts Supreme Judicial Court would likely not require an amendment to the MCAD claim. See Smith, 949 F.Sup. at 948 (holding that the requirement of a separate administrative filing for retaliation claims would serve only to increase costs to the plaintiff).
To establish causation, an employee may establish an inference based on the timing between the complaint of discrimination and the adverse employment action. Mole, 442 Mass, at 592. The mere fact that one event followed the other is not sufficient to establish causation by itself, but where the temporal gap is very close, an inference of causation is permissible. Id. at 592, 595. It follows then, when an adverse employment action or problems with an employee predate the employer’s knowledge that the employee had engaged in protected activity, an inference is not permissible. Id. at 594. The “pattern exception,” however, operates similar to the continuing violations theory. Under this rule, “a series of retaliatory measures starting shortly after the protected activity can justify the inference that a particular action in that series, although occurring a considerable time later, is still motivated by retaliation.” Mole, 442 Mass, at 596.
Additionally, “[t]he involvement of a third person as the actual decision maker will not break the causal connection if that decision maker merely ‘rubber stamps’ the recommendation of the retaliating supervisor.” Mole, 442 Mass, at 599. In this case, the fact that Zukauskas was technically the one to terminate Ahanon, based on the recommendation of McWalter and Spencer, is not an impediment to the plaintiffs claim.
Ahanon claims that he engaged in activity protected by G.L.c. 151B when he met with Spencer on January 19, 2001 and told him that he was concerned that McWalter wanted to fire him because of his race or handicapped status. Assuming this meeting took place as described by the plaintiff, this activity would be sufficient to activate the protection of c. 151B, §4(4). On January 14, 2002, Ahanon was terminated from his employment with the defendant.
To prevail on a retaliation claim, the defendant employer would have to take an adverse employment action against the plaintiff closely following this protected activity. The pleadings are clear that Ahanon was subject to discipline and close monitoring prior to January 19, *72 2001. Further, it was almost a year after this protected activity that the plaintiff was terminated, allegedly in retaliation for complaining of discrimination. The court finds that the causal nexus is too attenuated for the plaintiff to sustain a claim of retaliation. The employer alleges they fired Ahanon for poor work quality. At or around the time that Ahanon was terminated, there is evidence in the record that Cerebral Palsy also terminated several white females for reasons similar to Ahanon. The plaintiff offers no evidence that he was terminated as a result of his complaint of discriminatory conduct. Rather, he relies merely on the sequence of events to support his cause of action. The court in Mole, explicitly addressed this issue and held that “(t]he mere fact that one event followed another is not sufficient to make out a causal link.” Mole, 442 Mass, at 592, quoting MacCormack, 423 Mass, at 662. This court finds little distinction from the Mole case, and holds thataclaimforretaliationunderG.L.c. 151B, §4(4) must fail.
V. Intentional Interference with Contractual Relations
“In an action for intentional interference with contractual relations, the plaintiff must prove that (1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive and means; and (4) the plaintiff was harmed by the defendant’s actions.” Harrison v. Netcentric Corp., 433 Mass. 465, 476 (2001). These types of claims apply to at-will employees. Id. at 477. However, “(s)ubject to rare public policy exceptions, employment at will can be terminated for any reason or for no reason.” Id. at 478.
To prove that the alleged interference was improper in motive and means, Ahanon must show that the defendant acted with actual malice. Weber, 434 Mass, at 781; Gram v. Liberty Mut Ins. Co., 384 Mass. 659 (1981). Malice in this context is defined as “a spiteful, malignant purpose, unrelated to the legitimate corporate interest” of an employer. Weber, 434 Mass, at 782, quoting Boothby v. Texon, Inc., 414 Mass. 468, 487 (1993). Unlawful discrimination does not automatically prove the existence of actual malice. Weber, 434 Mass, at 782. The individual defendant’s behavior “must rise to the level of personal hostility or ill-will to satisfy the malice standard.” Id. at 783. See Gram, 384 Mass, at 664. A corporate official’s unfair or poor management is “an insufficient basis to negate the official’s broad privilege to terminate an at-will employee.” Weber, 434 Mass. at 783. See Gram, 384 Mass, at 665.
McWalter’s behavior towards Ahanon does not negate her privilege. Ahanon claims that McWalter’s actions were unfair and unjustified. McWalter counters that all of her actions concerning Ahanon were in response to his poor performance. Viewing the evidence in a light most favorable to Ahanon, even if Ahanon was treated poorly or unfairly by McWalter, that is still not enough to sustain a cause of action. In order to prevail, Ahanon must show actual malice, which he fails to do. Unfair and unjust is not the same thing as spiteful and malignant. Other than Ahanon’s belief that McWalter was out to get him, there are no facts that would indicate the presence of malice, much less that McWalter was motivated by personal animosity or ill will. As a result, Ahanon has shown insufficient evidence to sustain his claim and summary judgment will be granted in favor of the defendant.
CONCLUSION
G.L.c. 151B is a statute designed to protect employees from unlawful discrimination. The statute is not designed to give an employee any additional rights. It is not enough for a plaintiff to show that he was treated unfairly. The claimant must show proof of discriminatory animus to sustain a claim. The failure of a court to recognize this burden would enhance the status of at-will employees who happen to be within classes protected by G.L.c. 15 IB, and would require that they be fired only for cause. This is not the purpose of the statute and the court will recognize only those claims that are covered by G.L.c. 151B.
ORDER
For the foregoing reasons, it is hereby ordered that the defendants’ motion for summary judgment is ALLOWED.

Sheny Milley, Barbara Angelo and Tracy Harris.

Nliere are some differences in the prima facie case, depending on the type of discrimination alleged, and the court will address those as they come up in this opinion. The parties did not focus on whether Ahanon had stated a prima facie case. Ahanon agreed at the oral argument that he is asserting a disparate treatment case only and so, although pled, the court will not address any possible claim of hostile work environment.

Blare made it seem that all an employee had to do to escape summary judgment was to present a prima facie case and dispute the asserted legitimate nondiscriminatory reason. Blare, 419 Mass, at 445-46 (summary judgment inappropriate where plaintiff presents prima facie case plus evidence of pretext). Lipchitz and Weber, among others, make it clear that the plaintiff always carries the burden of proving discriminatory animus. Lipchitz, 434 Mass. at 504 (plaintiff must prove discriminatory animus); Weber, 434 Mass, at 775 (plaintiff must prove at trial that the employer harbored discriminatory animus). If that failure of proof is evident at the summary judgment stage, then there is no reason to proceed further. Kourouvacilis v. General Motors Corp., 410 Mass. at 716 (where party has no reasonable expectation of proving an essential element of his case, summary judgment is appropriate).

Effective November 5, 2002, the applicable statute of limitations was modified from six months to 300 days.

The specific date was not provided by either party.

The court recognizes that the measure is not the number of incidents, but rather, the magnitude of all the incidents taken together. It is possible for one incident to be so egregious as to demonstrate discriminatory animus on its own. This is not such a case.